Tihanne K. Mar-Shall, OSB #224504
Assistant Federal Public Defender
Email: Tihanne_Mar-shall@fd.org
Peyton Lee, OSB #164224
Assistant Federal Public Defender
E-mail: Peyton_Lee@fd.org
101 S.W. Main Street, Suite 1700
Portland, OR 97204
Tel. (503) 326-2123
Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SELVA DELANO MUDALIAR,<br><br>Defendant. | Case No. 3:24-cr-00340-MO<br><br>MOTION TO EXCLUDE EXPERT TESTIMONY OF YONSOO LEE AND REQUEST FOR *DAUBERT* HEARING |

The defendant, Selva Delano Mudaliar, through his attorneys Tihanne K. Mar-Shall and Peyton Lee, moves pursuant to Fed. R. Crim. P. 16 and under Federal Rules of Evidence 403, 404(b), 702, 703, and the Sixth Amendment's Confrontation Clause to exclude the proposed expert testimony of Tigard Police Detective and FBI Task Force Officer Yonsoo Lee. *See* ECF No. 70 (Gov't Expert Notice). In the alternative, Mr. Mudaliar requests a hearing on the reliability of that testimony under the Court's gatekeeping role. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

## RELEVANT FACTS

Mr. Mudaliar is charged with one count of sex trafficking by force, fraud, or coercion, 18 U.S.C. § 1591(a)(1), and one count of transporting an individual to engage in prostitution, 18 U.S.C. § 2421(a). The indictment alleges that Mr. Mudaliar drove AV1 from Oregon to Washington, where he allegedly forced her to attempt a commercial sex act against her will.

*i. Detective Lee's training and experience.*

The government has noticed Detective Lee to opine on the terminology and coded language of sex trafficking as well as the "relationship between sex trafficker and victim." ECF No. 70 at 2–6. The stated bases for those opinions are "his training and experience, as described below and further detailed in his resume[.]" *Id.* at 6. The notice describes that experience as twenty-six years in law enforcement, twenty-one years as an FBI Task Force Officer, "extensive specialized training on human trafficking . . . from a variety of government and non-government instructors," "over one hundred investigations into sex trafficking and sexual exploitation," and interviews with "over a hundred victims[.]" *Id.* at 9. The resume lists a 2007 Master of Science in Psychology from Capella University. *Id.* at 10. A particular method is not identified.

*ii. Detective Lee's proposed expert testimony.*

Detective Lee has been noticed to testify about various "terms" associated with sex trafficking, as well as seven broad areas of conclusions about the possible "relationship" between sex trafficker and alleged victim. *Id.* at 3–6. These conclusions are couched in extremely broad terms, including that the sex trafficker's role "varies widely and depends, in part, on the victim's stage in the trafficking relationship," that "every victim is different," and that "sex traffickers may use different approaches with different victims [and] tailor their approach based on each victim's particular vulnerabilities." *Id.* at 3, 4.

He further proposes to testify that traffickers keep victims compliant "through some combination of force, fraud and/or coercion[.]" *Id.* at 5. Additionally, the notice claims that "[w]hen traffickers book hotel rooms for victims, they often book the hotel room and then leave the area to allow the victim to engage in commercial sex without the 'trick' or 'john' knowing about the trafficker's existence." *Id.* at 4. The government has also not noticed every opinion Detective Lee may offer but "reserves, and does not waive, the right to elicit additional testimony from Detective Lee." *Id.* at 6.

Apart from its notice filed on September 2, the government has not provided the defense with any expert report from Detective Lee, or any other reports from Detective Lee in which he describes opinions he may have about sex trafficking.

*iii. The relevant facts of this case.*

Mr. Mudaliar was originally arrested by the Tigard Police Department ("TPD") for assault in the second degree and strangulation. ECF No. 1-1, Criminal Complaint, at 6. Detective Lee joined the case after February 21, 2024, the date Mr. Mudaliar left the country, to assist in investigating his alleged unlawful flight to avoid prosecution. *Id.* at 7. It was at that time, twenty-six months after the incident, that a TPD detective told Detective Lee she had conducted a follow-up interview of AV1 and "believed there were elements of sex trafficking in AV1's disclosure to her that merited follow up investigation." *Id.*

Detective Lee first spoke with AV1 on March 5, 2024, twenty-seven months after the alleged incident. *Id.* at 8. She told him that "in hindsight, it is very clear to her that [Mr. Mudaliar] was planning on selling her . . . for prostitution," and that "in retrospect," he had said "a number of things during the earlier part of their relationship that she should have paid closer attention to." *Id.* She explained that he had admitted he "had been arrested for promoting

prostitution in the past," and that he had once texted her an angry message about her being "out of pocket"—a phrase she "had no idea" the meaning of at the time, and which her "friend who had previously been a prosecutor later explained to her was street slang associated with sex trafficking." *Id.* at 8–9.

That friend is Dave Peters, a former district attorney who is allegedly familiar with Mr. Mudaliar's parole officer and who sent AV1 an article about Mr. Mudaliar's prior prostitution case. Bates 0001042. Although the affidavit calls him AV1's "friend," ECF No. 1-1 at 9, AV1 has elsewhere called him her boyfriend. *See, e.g.*, Bates 0001042; Bates 0001021; Bates 0001041. In those same reports, AV1 told police that Mr. Mudaliar was "just a friend" and that they had not had sex for over two months. Bates 0001041.

Based on the allegations in the Criminal Complaint and Affidavit from Detective Lee, AV1 alleges that on December 3, 2021, she and Mr. Mudaliar met the "john" in this case while out at a club in Portland, Oregon, following a dinner date. ECF No. 1-1 at 8. Mr. Mudaliar was present and known to the alleged "john" at all times. According to the affidavit, Mr. Mudaliar arranged to sell the man cocaine after meeting him at the club, and the three of them went to an ATM together and eventually drove together in Mr. Mudaliar's car to Vancouver, Washington. *Id.* at 8–9. They arrived at the man's hotel room in Vancouver, a room he had booked for himself while in town on business. *Id.* at 9–10.

Once there, on AV1's account, the two men "began openly negotiating right in front of her," and Mr. Mudaliar "didn't even hide the fact that he was a pimp[.]" *Id.* at 10. She claims that Mr. Mudaliar "linger[ed]" in the room, and eventually after he left, the customer told her he did not want to have sex with her and instead gave her a blank check to fill out for "whatever amount would appease" Mr. Mudaliar. *Id.* at 10–11. She then got back in Mr. Mudaliar's car, gave him

the check which he crumpled and tossed away, and then hit her while they drove back to his apartment. *Id.* It was after the alleged assault at his apartment that she called 911, resulting in the Washington County arrest of Mr. Mudaliar and the pending state charges.

## LAW AND ARGUMENT

### I. Introduction

The Court should prohibit Detective Lee from testifying about what he believes to be typical of sex traffickers. First, the notice fails to satisfy the requirements of Rule 16. In addition, any expert opinion would be based on unreliable methodology, and insufficient facts or data. Fed. R. Evid. 702. The testimony does not "fit" the facts of this case, and to the extent that it has any probative value it is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. Finally, any testimony would violate the Confrontation Clause and Rule 703.

### II. The government's expert notice fails to satisfy the requirements of Rule 16 and Detective Lee's testimony should be excluded.

Rule 16(a)(1)(G)(iii) requires the government to furnish to the defendant "a *complete* statement of all *opinions* that the government will elicit from the witness in its case-in-chief" and "the bases and reasons for them." Fed. R. Crim. P. 16(a)(1)(G)(iii) (emphasis added). The rule "is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment. "The Rule requires a summary of the expected testimony, not a list of topics." *United States v. Duvall*, 272 F.3d 825, 829 (8th Cir. 2001); *see also United States v. Barile*, 286 F.3d 749, 758–59 (4th Cir. 2002) (affirming exclusion of defense expert testimony because defendant did not provide notice of the witness's reasoning); *United States v. Hoffecker*, 530 F.3d 137, 187–88 (3d Cir. 2008) (affirming exclusion of defense expert because

notice did not include the expert's opinions and the bases and reasons for the opinions); *United States v. Kaufman,* No. 19-cr-504 (LAK), 2021 WL 4084523, at *19 (S.D.N.Y. Sept. 8, 2021) ("Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's *actual opinions*.") (internal quotation and citation omitted) (emphasis added).

In *Duvall,* the government stated that a police officer would testify about "code language, the manner in which methamphetamine is distributed, tools of the trade in the distribution of methamphetamine, street prices of methamphetamine and the manner in which 'cut' is added to methamphetamine to increase the amount of profit in the methamphetamine business" and about "amounts of methamphetamine an individual might have for distribution, as opposed for personal use." 272 F.3d at 828. The court held that the government's notice was inadequate for only supplying a list of topics the expert would discuss, but did not reverse because the defense did not identify any prejudice that would have been avoided by a more detailed notice. *Id.* at 829.

Here, while the government's notice is longer than it was in *Duvall,* it is otherwise similar in nature. Rather than explain specific opinions that Detective Lee will offer as they relate to this case, the government cites a long list of general topic areas and vague potential relationship dynamics that Detective Lee will testify about. In addition to not describing Detective Lee's opinions in sufficient specificity, the government's notice fails to state the bases and reasons for those opinions other than to assert that he will testify based on his "training and experience." ECF No. 70 at 6. But, as the Oregon Court of Appeals notes, "[t]he phrase 'training and experience' is not a magical incantation with the power to imbue speculation, stereotype, or pseudoscience with an impenetrable armor of veracity." *State v. Daniels*, 234 Or. App. 533, 541, 228 P.3d 695 (2010).

The inadequacy of the government's disclosure will prejudice Mr. Mudaliar. Specifically, the Sixth Amendment to the United States Constitution guarantees Mr. Mudaliar the right to confront witnesses and the right to effective assistance of counsel. Cross examination of an expert witness is a formidable task. It appears that Detective Lee plans on offering the sort of "heads I win, tails you lose" testimony that is common with pseudo-scientific law enforcement expert testimony in which everything a criminal defendant does is interpreted to be consistent with the crime charged. Such vague, amorphous opinion testimony is impermissible and fails to satisfy the notice requirements of Fed. R. Crim. P. 16.

## III. Detective Lee's proposed testimony is inadmissible under Federal Rules of Evidence 702, 403, And 404(b).

As the Ninth Circuit has stated, "testimony of criminal profiles is highly undesirable as substantive evidence because it is of low probativity and inherently prejudicial." *United States v. Gillespie,* 852 F.2d 475, 480 (9th Cir. 1988). The Ninth Circuit has described profile testimony about drug couriers as "inherently prejudicial to the defendant because the profile may suggest that innocuous events indicate criminal activity." *United States v. Lim,* 984 F.2d 331, 334–35 (9th Cir. 1993). "Every defendant has a right to be tried based on evidence against him or her, not on the techniques utilized by law enforcement officials in investigating criminal activity." *United States v. Lui,* 941 F.2d 844, 847 (9th Cir. 1991) (quoting *United States v. Beltran-Rios,* 878 F.2d 1208, 1210 (9th Cir. 1989)).

Federal Rule of Evidence 702 imposes on the district court a "gatekeeping" obligation to assess both the relevance and the reliability of expert testimony, scientific or otherwise, before it is admitted. *Daubert*, 509 U.S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The gatekeeper role "entails a preliminary assessment of whether the reasoning or methodology

underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93.

It applies equally to all expert testimony, not only the scientific. *Kumho Tire*, 526 U.S. at 148. "[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . , the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." *Id.* at 149 (quoting *Daubert,* 509 U.S. at 592). The district court has "broad latitude" to structure the inquiry, which is "flexible" and "must be tied to the facts of a particular case." *Id.* at 142, 150. But Rule 702 is not so flexible that the court may abstain from making a reliability finding at all. *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020).

**A. The methodology underlying Detective Lee's testimony is not reliable.**

Although courts admit law enforcement testimony about the culture and nomenclature of criminal groups, "its use must be limited to those issues where sociological knowledge is appropriate." *United States v. Mejia,* 545 F.3d 179, 190 (2d Cir. 2008). "An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence." *Id.*

To be fair, Courts have affirmed the admission of law enforcement expert testimony about prostitution. *See, e.g.*, *United States v. Brooks*, 610 F.3d 1186, 1195–96 (9th Cir. 2010) (police officer assigned to vice unit). They have also affirmed expert testimony of persons who have studied prostitution academically. *See, e.g.*, *United States v. Taylor,* 239 F.3d 994, 997–98 (9th Cir. 2001) (academic expert on prostitution); *United States v. Anderson,* 851 F.2d 384, 392 (D.C. Cir. 1988) (sociologist). However, pursuant to a district court's gatekeeping function as

explained in *Daubert* and its progeny, the issue is not whether such testimony may be admissible in the abstract or in other cases, but whether a *particular* expert's opinions, in whole or in part, are supported by reliable reasoning and methodology.

When the testimony is "experience-based," reliability becomes more important, not less, precisely because it is not subject to scientific testing. *Valencia-Lopez*, 971 F.3d at 898. An officer's qualifications are relevant and indeed necessary, but they cannot by themselves establish reliability. *Id.* at 900. The question is not whether the expert has sufficient "background for his opinion[;] [r]ather the issue is whether he provided a reliable basis for his specific opinion[.]" *Id.* at 901.

It is not enough for a law enforcement expert to assert that he has training and experience to draw upon; the proponent must establish that the methodology actually used is reliable. *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002); *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) ("A district court must distinguish an expert's *qualifications* from the *reliability* of the expert's principles and methods.") (emphasis in original). That burden falls on the party offering the witness. *Valencia-Lopez*, 971 F.3d at 900 (quoting *Hermanek*, 289 F.3d at 1094). Circular, subjective reasoning does not satisfy Rule 702. *Hermanek*, 289 F.3d at 1096. And the court must exclude an opinion when "there is simply too great an analytical gap between" the expert's experience and his conclusion. *Id.* at 1095.

*Hermanek* is instructive. There, an FBI agent testified that a wide variety of slang words were consistent with cocaine trafficking, sometimes interpreting the same word to mean multiple and contradictory things depending on "context." *Id.* at 1091–92. The trial court, pre-*Kumho Tire*, found that the agent's general qualifications, absent any explanation of his methods, supplied a reliable basis for those interpretations. *Id.* at 1094. The Ninth Circuit held that this

was error: “[a]s a prerequisite to making the Rule 702 determination that an expert’s methods are reliable, the court must assure that the methods are adequately explained.” *Id.* The agent was required to establish how he applied his experience to interpret *particular* words and phrases in *particular* conversations. *Id.* at 1095 (emphasis added). Because he instead read cryptic language as referring to cocaine simply because he believed the appellants to be cocaine traffickers, his circular and subjective reasoning failed Rule 702. *Id.* at 1096.

Detective Lee’s proposed testimony has the same defects. Like the agent in *Hermanek*, he will tell the jury that a wide swath of ordinary conduct (booking a hotel room, giving someone a ride, using common slang terms), is consistent with sex trafficking. And like that agent, he offers no methodology at all. The government states that the “bases and reasons” for his opinions are “his training and experience.” ECF No. 70 at 6. That is a statement of qualifications, not of method, and *Hermanek* holds that qualifications alone cannot carry the reliability burden. 289 F.3d at 1094–95. Detective Lee has not explained how he moves from years of policing to a conclusion about what Mr. Mudaliar’s conduct signifies.

His reasoning is also circular and subjective. Detective Lee will testify that the trafficker’s role “varies widely,” that “every victim is different,” and that traffickers “tailor their approach based on each victim’s particular vulnerabilities.” ECF No. 70 at 3–4. An opinion framed this way cannot be tested: any fact, and its opposite, confirms it. A theory that accommodates everything excludes nothing, and it conveys to the jury only that the witness believes the defendant is guilty. *See Hermanek*, 289 F.3d at 1096. It is unclear what methodology Detective Lee even purports to be applying in asserting broadly what patterns might occur in “relationships” between alleged victims and traffickers.

The relevant *Daubert* factors for assessing an expert's methodology include whether it has "been subjected to peer review and publication" and whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592–94). These factors serve the object of the gatekeeping role: ensuring that an expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Id.* at 152. Reliability turns not on the "correctness of the expert's conclusions but the soundness of his methodology." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse *dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

What Detective Lee appears to have done is conduct an unscientific sociological survey, in which he draws his own conclusions (although specific conclusions are not actually listed in his notice) based on his more than one-hundred interviews of victims of sex trafficking. ECF No. 70 at 6. As articulated above, it appears he is prepared to testify that a vast array of behavior is consistent with sex trafficking because of his own experience of conducting investigations.

The entire notion that there are certain characteristics that are common amongst sex traffickers is contradicted by science. With the passage of the Trafficking Victims Protection Act (TVPA)[1] in 2000, there has been a tremendous increase in funds and focus dedicated to

---

[1] Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464.

"prosecuting and imprisoning pimps, as traffickers."[2] Third parties who may benefit from commercial sex activities under the new TVPA paradigm are assigned roles as "criminal traffickers." Marcus et al*., supra* note 1, at 154. "What is missing from these accounts is *actual independent scholarly knowledge about contemporary sex markets* in the USA and the actual relationships between sex workers and their market facilitators." *Id.* (emphasis added). After two years studying prostitution in New York City and Atlantic City, researchers from the John Jay College of Criminal Justice, City University of New York, concluded that "the simplistic one-size-fits-all narrative of the [] victim and the adult exploiter inherent in [TVPA] policy does not reflect the realities of street-based sex work in the USA." *Id.* at 153.

In a separate study published in 2013, researchers funded by the National Institute of Justice sought to explore the beliefs and motivations of law enforcement officials, youth service providers, not-for-profit directors, and clergy working on a federal anti-trafficking task force in Atlantic City, New Jersey.[3] The researchers were assured by task-force members that Atlantic City was facing a commercial child sexual exploitation "epidemic," and that they would easily be able to find 300 victims to interview quickly. Marcus & Curtis*, supra* note 2, at 4. Despite vast experience interviewing vulnerable and hidden populations, over the course of several months the researchers were only able to find 10 minors in the sex trade, and only one of them had a sex trafficker. *Id.* at 7. One FBI agent blamed the researchers, asserting that by asking sex workers when they first exchanged sex for money, the researchers were using language that was

---

[2] Anthony Marcus et al., *Is Child to Adult as Victim Is to Criminal?: Sex Work and the Construction of Underage Sexual Labor in the United States*, 9 Sexuality Rsch. & Soc. Pol'y 153–166 (2012).

[3] Anthony Marcus & Ric Curtis, *Implementing Policy for Invisible Populations: Social Work and Social Policy in a Federal Anti-Trafficking Taskforce in the United States*, Soc. Pol'y & Soc'y, 1 (2013).

"too academic." *Id.* at 6. Despite the fact that most of the staff participating in the taskforce had never met a young girl who was a victim of commercial exploitation, the researchers were assured there were "thousands" of victims in Atlantic City, but they were simply too controlled by their traffickers to talk. *Id.*

It is entirely unclear what methodology, if any, Detective Lee used in forming the vague opinions he purports to offer at trial. However, what little scientific research has been conducted about the relationships in the sex industry demonstrates that law enforcement opinions about what is "typical" of these relationships are, more often than not, inaccurate, as there is no "typical" relationship or practice that has been documented. Testimony is unreliable when the field of expertise claimed by the expert is not known to reach reliable results for the type of opinion offered. *See Kumho Tire*, 526 U.S. at 151 (noting that *Daubert*'s general acceptance factor does not "help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy").

Additionally, opinions about the profiles of sex trafficking perpetrators and victims are at bottom claims of social science. Recent empirical work casts doubt on law enforcement's ability to reliably proffer such testimony, even where the academic research may support particular scientific conclusions or claims:

> [T]his study found that criminal legal system data has significant limitations for understanding the underlying empirical realities of trafficking more broadly. *Law enforcement personnel are not conducting research*, and they create data for the purpose of gathering evidence in furtherance of making a criminal case against a perpetrator, according to legal definitions.[4]

---

[4] Kelle Barrick et al., *Assessing the Use of Law Enforcement and Prosecutorial Case Files to Understand Sex Trafficking in the United States: Caveats and Considerations*, J. Hum. Traffick. 1, 12 (2025) (emphasis added).

In addition, the advanced degree on which Detective Lee partly rests his reliability provides no further reassurance as to his qualification to discuss such academic research. He cites a 2007 online Master of Science in Psychology from Capella University, a for-profit institution. ECF No. 70 at 10. That degree does nothing to train Detective Lee in evaluating empirical research on sex markets.

Detective Lee's methodology rests solely on unscientific experience; his law enforcement case files are a poor proxy for the empirical research of trafficking, and even the scientific literature in the field has failed to provide a sufficient academic foundation for such generalized conclusions as he proposes asserting about the "relationships" between traffickers and victims. As such, his purported testimony cannot satisfy Rule 702.

**B. Even if the methodology were reliable, his testimony does not fit the evidence of this case as required under Rule 702; to the extent that it does, it amounts to impermissible vouching and does not aid the jury.**

Expert testimony must also "fit" the facts of the case. *Daubert*, 509 U.S. at 591; Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Detective Lee has testified as a sex trafficking expert in previous trials, and his expert notice has remained largely the same from case to case. *See, e.g.*, *United States v. Harris*, No. 3:23-cr-00076-AN (D. Or. 2023), ECF No. 108. The government offers that experience as a basis for helping the jury decide that Mr. Mudaliar's alleged conduct is consistent with sex trafficking. But the generic testimony he has given elsewhere does not fit this case; in material respects it cuts the other way.

For example, Detective Lee proposes to testify that "[w]hen traffickers book hotel rooms for victims, they often book the hotel room and then leave the area to allow the victim to engage in commercial sex without the 'trick' or 'john' knowing about the trafficker's existence." ECF No. 70 at 4. This case is the opposite in every particular. Mr. Mudaliar did not book the room; the

customer had booked it himself while in town on business. ECF No. 1-1 at 9. Mr. Mudaliar did not leave the area; he drove the customer and AV1 there in his own car, followed them into the room, and lingered until the customer told him to leave. *Id.* at 9–10. And far from concealing his existence, he allegedly negotiated openly in front of both of them and told the customer that AV1 was "his girl" and that he was her pimp. *Id.* at 10. Testimony about traffickers who hide from the customer cannot help a jury evaluate a defendant who, on the government's own account, did not.

Additionally, in other cases he has noticed opinions completely inapposite to the case at issue here. In *United States v. Harris*, No. 3:23-cr-00076- AN (D. Or. 2023), ECF No. 108, he proposed to testify that "cash is king" when it comes to sex trafficking, i.e. that the primary form of payment for commercial sex is cash. ECF No. 108 at 8. Here, the allegation instead is that Mr. Mudaliar left the hotel room without payment and that AV1 obtained only a blank check as a form of payment for the alleged sexual transaction. ECF No. 1-1 at 11.

On the other end of the spectrum, Detective Lee proposes to testify generally that traffickers keep victims compliant "through some combination of force, fraud and/or coercion"—the statutory elements themselves of the offense Mr. Mudaliar is charged with. ECF No. 70 at 5. Where Detective Lee's testimony has been crafted to broadly fit the alleged facts of this case, it is so generic as to fail to aid the jury and to amount to impermissible vouching for AV1.

"'Those jurisdictions that have considered profiles of battering parents, pedophiles, rapists, and drug couriers unanimously agree that the prosecution may not offer such evidence in its case-in-chief as substantive evidence of guilt.'" *United States v. Wells,* 879 F.3d 900, 922 (9th Cir. 2018) (quoting *Ryan v. State,* 988 P.2d 46, 55 (Wyo. 1999)). When an officer testifies as an

"expert" that the behavior of the defendant is consistent with the crime he is charged with, the officer usurps the role of the jury.

While "any effective law enforcement agency will necessarily develop expertise on the criminal organizations it investigates . . . when those officer experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense." *Mejia,* 545 F.3d at 191. "[T]hat sort of usurpation of the jury's role is unacceptable even in the civil context." *Id.; see also United States v. Nersesian,* 824 F.2d 1294, 1308 (2d Cir. 1987) (warning that the use of law enforcement experts, if not closely monitored by district courts, may unfairly "provid[e] the government with an additional summation by having the expert interpret the evidence," and "may come dangerously close to usurping the jury's function.").

Here, Detective Lee's testimony should be excluded because allowing an officer to testify about what is typical of sex traffickers either fails to meet the facts of this case, or provides so generic and sweeping of a claim that it amounts to little more than an opinion that Mr. Mudaliar is guilty and impermissibly takes over the role of the jury.

### C. Detective Lee's testimony will be substantially more prejudicial than it is probative.

Because Detective Lee's testimony is neither the product of reliable methods nor based on sufficient facts or data, it amounts to little more than an opinion that Mr. Mudaliar is guilty. A court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice or of misleading the jury. Fed. R. Evid. 403. Testimony is unduly prejudicial when it has "an undue tendency to suggest decision on an improper basis." *United States v. Allen*, 341 F.3d 870, 888 (9th Cir. 2003).

Detective Lee's testimony is at most nominally relevant, and it is not probative because it is unreliable. He identifies no methodology or data set beyond his qualifications; his credentials do not support him as a social science researcher; and much of what he intends to say does not fit these facts, or matches by merely generically asserting Mr. Mudaliar's guilt in the offense.

The prejudice, by contrast, is substantial. There is a serious risk that a jury will give undue weight to opinion testimony from a police officer. *United States v. Dukagjini*, 326 F.3d 45, 53 (2d Cir. 2003). In *Dukagjini*, the prosecution called a DEA agent to interpret recorded conversations, including the meaning of words like "dry" and "cooked." *Id.* at 50. The Second Circuit observed "that the use of the case agent as an expert increases the likelihood that inadmissible and prejudicial testimony will be proffered," because "when a fact witness or a case agent also functions as an expert for the government, the government confers upon him the aura of special reliability and trustworthiness surrounding expert testimony." *Id.* at 53 (internal quotation marks omitted). "This aura creates a risk of prejudice because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial[.]" *Id.* (internal citations and quotations omitted).

When a case agent bases his opinion in part on the testimony of fact witnesses, the testimony "suggests to the jury that a law enforcement specialist . . . believes the government's witness[] to be credible and the defendant to be guilty, suggestions we have previously condemned." *United States v. Cruz*, 981 F.2d 659, 663 (2d Cir. 1992); *see also United States v. Alvarez*, 837 F.2d 1024, 1030 (11th Cir. 1988) ("When the expert is a government law enforcement agent testifying on behalf of the prosecution about participation in prior and similar cases, the possibility that the jury will give undue weight to the expert's testimony is greatly increased."). When officers testifying as experts simply share their factual knowledge with the

jury, they no longer aid the factfinder; they instruct it on the existence of the facts needed to satisfy the elements of the offense. *Mejia,* 545 F.3d at 191.

Here, allowing an officer to testify about what is typical of sex traffickers—which, on the government's theory, will be everything Mr. Mudaliar and AV1 did and will leave out anything missing in this case—in a case charging sex trafficking, amounts to an opinion that Mr. Mudaliar is guilty, and infringes on the role of the jury. Testimony Detective Lee has offered in other cases contradicts the conclusion he would have the jury draw here. Yet he intends to offer sweeping, subjective opinions about what a typical sex trafficker does, and given his status as a law enforcement officer the jury is likely to take those opinions at face value despite the paucity of reliable method behind them.

Because whatever probative value his opinions carry is dwarfed by the prejudice that accompanies a witness the jury will over-credit, Detective Lee's testimony should be excluded under Rule 403.

### D. Detective Lee's proposed testimony is inadmissible under Federal Rule of Evidence 404(b).

Federal Rule of Evidence 404(b) prohibits the introduction of character evidence to prove a person acted in accordance with that character trait. Fed. R. Evid. 404(b). As noted by the Ninth Circuit in *Wells*, courts exclude criminal profile evidence on a variety of grounds, including that it is "impermissible character evidence." *Wells,* 879 F.3d at 922 (citing, *Haakanson v. State,* 760 P.2d 1030, 1036 (Alaska Ct. App. 1988) ("We hold that the prosecution may not introduce a profile to show that the defendant more likely committed an offense because the defendant fits within that profile. To admit this testimony at the beginning of trial was clearly erroneous.")). Thus, the Court should also exclude Detective Lee's proposed testimony as impermissible character evidence.

## IV. Detective Lee's testimony violates the Sixth Amendment Confrontation Clause and Rule 703.

Detective Lee's testimony also implicates the Confrontation Clause. Because he identifies no reliable methodology, what he offers is essentially hearsay testimony and a conduit for out-of-court statements. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004). An expert may base an opinion on otherwise inadmissible evidence, including hearsay, only if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703.

*Mejia* illustrates the problem. There, an agent qualified as a gang expert relied on custodial interrogations of MS-13 members as the basis for testimony that the gang taxed its members and used interstate telephone calls to coordinate, a material element of the charged offense. 545 F.3d at 193–99. The Second Circuit held that the testimony violated the Confrontation Clause because the agent presented testimonial hearsay "in the guise of an expert opinion." *Id.* at 199. The agent had not conducted any "synthesis of various source materials" or applied "extensive experience and a reliable methodology"; he simply repeated what a detainee had said. *Id.* at 197.

So too here. Detective Lee is expected to testify that traffickers keep victims compliant "through some combination of force, fraud and/or coercion," again a core element of the offense. ECF No. 70 at 5. Like the agent in *Mejia*, his testimony relies generally on hearsay instead of established reliable methods. Testimony that repackages out of court statements as expert opinion violates the Confrontation Clause. Additionally, experts in the field would not reasonably rely on them and such opinions therefore violate Rule 703.

**CONCLUSION AND RELIEF REQUESTED**

For the foregoing reasons, the Court should enter an order prohibiting Detective Lee from expressing any opinion about the common practices or profile of individuals involved in sex trafficking. In the alternative, Mr. Mudaliar requests a hearing to determine the reliability of Detective Lee's anticipated testimony.

Respectfully submitted this 14th day of September, 2026.

*/s/ Tihanne K. Mar-Shall*
Tihanne K. Mar-Shall, OSB #224504

*/s/ Peyton Lee*
Peyton Lee, OSB #164224