SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**MIRA CHERNICK, MASB #696845**
Mira.Chernick@usdoj.gov
**WILLIAM M. McLAREN, OSB #143836**
William.McLaren@usdoj.gov
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:24-cr-00340-MO** |
| **v.** | **UNITED STATES' RESPONSE TO DEFENDANT'S *DAUBERT* MOTION (ECF 72)** |
| **SELVA DELANO MUDALIAR,** | |
| **Defendant.** | |

Defendant challenges the United States' notice of expert witness Tigard Police Department Detective Yonsoo Lee on two grounds—that the notice was inadequate under Federal Rule of Criminal Procedure 16(a)(1)(G), and that his testimony should be excluded under *Daubert v. Merrel Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579 (1993). ECF No. 72. Defendant asserts that the government's expert notice failed to state the opinions to which Detective Lee will testify at trial as required by Rule 16, and that his testimony regarding sex trafficking practices is neither reliable nor relevant as required by *Daubert* and the Federal Rules of Evidence. The weight of the Ninth Circuit's case law is against him.

**A. Rule 16**

Defendant asserts that the government's expert notice does not describe the opinions to which Detective Lee will testify with sufficient specificity. He complains that the notice does not "explain specific opinions that Detective Lee will offer as they relate to this case," and that it instead "cites a long list of general topic areas and vague potential relationship dynamics that Detective Lee will testify about." Mot. at 6. This mischaracterizes the government's notice.

The expert notice lists nine specific terms or types of coded language relevant to sex trafficking and the facts of this case that Detective Lee will explain to the jury. Some of these terms are merely defined, while other are accompanied by an expert opinion related to the term defined. For example, subparagraph 1a defines the terms "Romeo pimp" and "finesse pimp," and goes on to describe the ways in which those types of traffickers manipulate victims compared to other types of traffickers, as well as the role of physical violence in both types of trafficking. ECF No. 70 at 3.

The notice then goes on to describe multiple additional areas that Detective Lee's testimony will address, along with the opinions to which he will testify. It is true that each area of testimony is introduced by a topic sentence that describes the general nature of the opinions the witness will offer.[1] But each topic sentence is followed by a list of the specific opinions Detective Lee will testify to on each topic. The government will not reiterate every one of those opinions here but, as a single example, paragraph 7 states that "Sex traffickers often use violence to punish victims for failing to earn enough money for the trafficker, or for disobeying the trafficker or other perceived acts of disrespect. The trafficker uses the fear of further violence to

---

[1] *See* William Strunk Jr. & E.B. White, The Elements of Style 16 (4th ed. 2000) ("As a rule, begin each paragraph with a topic sentence; end it in conformity with the beginning.").

force the victim into compliance and prevent them from resisting the trafficker. Similarly, sex traffickers often use violence of the threat of violence to discourage victims from leaving the trafficker or reporting the trafficker to law enforcement." ECF No. 70 at 5–6. Those are opinions.

Defendant asserts that the government's expert notice—which contains approximately four full pages describing the opinions Detective Lee will offer at trial—is similar to the notice in *United States v. Duvall*, 272 F.3d 825 (7th Cir. 2001). It is not. The notice in *Duvall* consisted of a single, two-sentence paragraph listing the general areas about which the expert witness intended to testify. A layperson would know nothing more about the methamphetamine trade after reading the *Duvall* notice than they knew before. Detective Lee's notice, in contrast, identifies and defines specific terms about which he will testify, and describes his specific opinions about multiple different aspects of sex trafficking that are relevant to this case. A layperson reading his notice would gain an understanding of sex trafficking jargon, the modus operandi of sex traffickers, and the role of violence in relationships between traffickers and their victims that they did not have before, which is of course the point of expert witness testimony. Detective Lee's testimony is properly noticed under Rule 16(a).

**B. *Daubert* and Federal Rules of Evidence 702, 403, and 404**

For expert testimony to be admissible, the court must find the expert to be qualified and his testimony to be relevant and reliable. *Daubert*, 509 U.S. at 589.

Federal Rule of Evidence 702 "contemplates a broad conception of expert qualifications," providing that an expert may be qualified either by "knowledge, skill, experience, training, or education." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994); Fed. R. Evid. 702. This is a "liberal" standard; a proposed expert need only exceed "the common knowledge

of the average layman" to qualify. *Holguin*, 51 F.4th at 853 (quoting *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002)).

Defendant does not challenge Detective Lee's qualifications. He has 26 years of experience as a law enforcement officer and has spent over 20 years as an FBI Task Force officer. ECF No. 70. He is specially trained in, and has extensive experience, investigating sex trafficking crimes, and has provided training on the topic to other law enforcement officers, as well as social workers and victim advocates. *Id.* He is an expert in the field.

**i. Detective Lee's Testimony is Highly Relevant**

An expert's testimony is relevant if "the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. Defendant argues that the jury does not need to hear Detective Lee's expert testimony about the commercial sex trade because his testimony does not fit the facts of this specific case. It most certainly does.

Detective Lee will testify about the relationship between traffickers and their victims, particularly the "Romeo" model of pimping that defendant employed in this case to entice and trick Adult Victim 1 ("AV1") into doing commercial sex work for him. He will describe the role of violence in this model of sex trafficking, which often follows similar patterns as domestic violence. Just as defendant tricked AV1 into thinking their relationship was romantic, the government expects him to attempt to convince the jury that his assault of AV1 on the night in question was a domestic dispute rather than an act of coercion in the context of sex trafficking. Detective Lee's description of "Romeo" pimps and how they use violence to coerce their victims

will help the jury make sense of the exact relationship dynamics that AV1 and Prior Victim 1 ("PV1")[2] will describe as central to their experience of being trafficked by defendant.

The Ninth Circuit supports the admission of expert testimony for this purpose because, "[b]y and large, the relationship between prostitutes and pimps is not the subject of common knowledge." *United States v. Taylor*, 610 F.3d 994, 996 (9th Cir. 2001); *see also United States v. Brooks*, 610 F.3d 1186, 1195–96 (9th Cir. 2010). Even if people are aware of the general tools of the trade—hotels, online ads, condoms—the social, emotional, and logistical tools are not well understood. *Taylor*, 239 F.3d at 998. And those are critical in helping the jury evaluate the other evidence they hear, particularly in assessing the credibility of victims. Triers of fact who are "in the dark" about the dynamics of controlling relationships "may be unprepared to assess the veracity of an alleged pimp, prostitute, or other witness testifying about prostitution." *Id.* Detective Lee's testimony will provide context for events that AV1 and PV1 are expected to testify about, including their initial naivety about defendant's plans to traffic them, their eventual compliance with his demands that they engage in sex work despite their shock and reluctance to do so, and their inability to immediately extricate themselves from defendant after he became threatening or violent towards them. This context is highly relevant to both the elements of the charged offenses and the credibility of two key witnesses.

Defendant points to specific facts or opinions, taken out of context or drastically misrepresented, to support his claim that Detective Lee's proposed testimony does not fit the evidence in this case. First, he asserts that Detective Lee's opinion that traffickers often minimize their overt involvement in commercial sex transactions is in conflict with the facts of

[2] PV1's testimony is the subject of the government's notice and motion in limine pursuant to Fed. R. Ediv. 404(b).

this case, where defendant openly identified himself as AV1's pimp and transported her to the intended customer's hotel. Mot. at 14–15. But Detective Lee's expert notice *also* includes the opinion that "in the beginning stages, the sex trafficker will take a more hands-on role in overseeing things like advertising . . . and transporting the victim for commercial sex." ECF No. 70 at 3-4. This was defendant's first time sex trafficking AV1, and his higher level of involvement in the transaction is entirely consistent with Detective Lee's proposed testimony.

Defendant also claims that Detective Lee's expert testimony in a previous federal sex trafficking trial that "cash is king" in sex trafficking, is inconsistent with this case because defendant received a blank check instead of cash as payment for the aborted commercial sex transaction. Mot. at 15. While it is true that AV1 brought defendant a blank check, it is also true that defendant brutally beat her as punishment for doing so, while repeatedly yelling at her that she was supposed to bring him cash. Those facts are a perfect illustration of Detective Lee's expert opinion that, in sex trafficking, "cash is king."

Defendant also argues that Detective Lee will be offering "profiling" evidence. He will not. Testimony that people who commit certain crimes tend to share a series of identified characteristics—a "criminal profile"—is a form of character evidence. *See United States v. Wells*, 879 F.3d 900, 920–21 (9th Cir. 2018). Its admissibility is strictly limited under the principle that "[o]ur law punishes people for what they do, not who they are." *Id.* at 920 (quoting *Buck v. Davis*, 580 U.S. 100, 123 (2017)).

In *Wells*—a workplace homicide case—the government's expert described the "typical pattern" of "individuals who would perpetrate a workplace targeted homicide." *Id.* at 918. That "pattern" was a list of traits; they are "virtually always" male, pathologically narcissistic, have an unreasonable sense of entitlement, and their acts are usually triggered by one or more workplace

humiliations. *Id.* at 918–19. The government then presented evidence that defendant had each of these traits and stated to the jury that the expert's testimony "fits Mr. Wells to a T." *Id.* at 920.

Detective Lee's proposed testimony is not like *Wells*. Detective Lee will not identify personality traits that build up to a typical sex trafficker profile. Instead, he will describe the means and methods that are often employed to commit the crime. The Ninth Circuit has "consistently held that government agents or similar persons may testify as to the general practices of criminals to establish the defendants' modus operandi." *United States v. Gil*, 58 F.3d 1414, 1422 (9th Cir. 1995) (quote omitted) (collecting cases); *see also United States v. Espinoza-Valdez*, 889 F.3d 654, 658 n.6 (9th Cir. 2018) (explaining that drug courier profile evidence is a "somewhat informal complication of characteristics believed to be typical of persons unlawfully carrying narcotics" (quoting *Reid v. Georgia*, 448 U.S. 438, 440, 100 S. Ct. 2752, 65 L. Ed. 2d 890 (1980)).

In accordance with prevailing Ninth Circuit law, courts in this district and elsewhere routinely admit this type of expert evidence for precisely the reasons that the United States offers it here. *See, e.g.*, *United States v. Harris,* 23-cr-00076-AN (D. Or. 2025) (admitting expert testimony by Detective Lee in sex trafficking trial); *United States v. Jackson*, 19-cr-458-MO (D. Or. 2022); *see also*, *United States v. Edwards*, 2017 WL 4159365 (D. Mo. Sept. 19, 2017); *cf. United States v. Graybael*, 2025 WL 618613 (9th Cir. 2025) (affirming Judge Immergut's admission of domestic violence expert testimony).

/ / /

**ii. Detective Lee's Experience and Opinions are Reliable**

Defendant also challenges the reliability of Detective Lee's proposed expert testimony. "A district court must distinguish an expert's qualifications from the *reliability* of the expert's principles and methods." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022). "While there is inevitably some overlap . . . they remain distinct concepts and the courts must take care not to conflate them." *Id.* (quote omitted).

The Court is obligated "to ensure that any and all scientific testimony . . . is not only relevant, but reliable," before allowing it to be presented to the jury. *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000). *Daubert*'s gatekeeping requirement applies to all expert testimony, not just testimony relating to the hard sciences. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (applying *Daubert* to expert testimony generally).

Although *Daubert*'s guiding factors—testability, peer review, error rate, general acceptance in the scientific community—do not translate well to social science expertise, *see Hankey,* 203 F.3d at 1167, the Court remains obligated to make an explicit preliminary finding of reliability before allowing the testimony. *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) ("the flexibility afforded to the gatekeeper goes to *how* to determine reliability, not *whether* to determine reliability"); *Holguin*, 51 F.4th at 853 ("Reliability findings must be made explicit on the record—an implicit finding does not suffice.") (quote omitted).

The Court may make the required reliability finding without holding a *Daubert* hearing, if the available record permits. *Holguin*, 51 F.4th at 852. "The district court's gatekeeping can be performed through numerous procedures—such as motion in limine briefing and oral argument, voir dire, and cross-examination at trial." *Id.* The Court has the discretion to use

whatever procedure will allow it to "discern an expert's methodology and to evaluate how that methodology connects to the expert's opinions." *Id.* at 853.

The reliability of an expert's methods depends on the testimony they will give. *Alatorre*, 222 F.3d at 1102. Here, Detective Lee will testify about the means and methods of sex trafficking, the common characteristics of victims that make them vulnerable to recruitment, the tactics often used by traffickers to trap and retain them, and the reasons why victims will comply with a sex trafficker's demands when they don't want to, all based on his training and extensive experience in the field. The reliability of this type of testimony can be based on an officer's experience and training, so long as it is sufficient to support the testimony. *Holguin*, 51 F.4th at 856 ("A law enforcement expert can reliably testify about the structure and activities of criminal organizations based solely on experience."). Rule 702's advisory committee "explicitly recognized that 'the application of extensive experience' is a 'method' that can reliably support expert testimony." *Id.* at 856 (quoting Fed. R. Evid. 702 note to 2000 amendment). Defendant's insistence that some higher standard of quantitative, scientific testing is required finds no support in the law. *See United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002) (quoting *Daubert*'s requirement that the "methodology" *or* "reasoning" underlying the testimony be valid, and noting that "the district court is granted broad discretion in determining how to satisfy its gatekeeping duty").

Defendant's concerns about the reliability of Detective Lee's testimony may be raised on cross-examination. But they are not a reason to exclude or limit the proposed testimony. Indeed, the Ninth Circuit has approved the admission of similar testimony as reliable. *See United States v. Holguin*, 51 F.4th 841 (9th Cir. 2022). In *Holguin*, the Ninth Circuit found that a federal agent's opinions about drug traffickers and their familiar expressions were reliably supported by

his twenty-seven years of experience conducting drug investigations. On that basis, he could reliably identify indicia that seized drugs were intended for distribution instead of personal use, and could testify to the meaning of coded language used in drug trafficking. *Id.* at 857. Similarly, Detective Lee's decades of experience in sex trafficking investigations, during which he has interviewed and reviewed the communications of numerous victims and traffickers, provide a reliable basis for him to testify about the relationship between traffickers and their victims and the methods traffickers use to control the women they traffic.

**iii. Defendant's Arguments Rely on the Research of Disgraced Authors**

In an attempt to call Detective Lee's experience and findings into question, defendant extensively cites the work of two researchers, Anthony Marcus and Ric Curtis, whose "science" he claims "contradict[s]" the premise of Detective Lee's proposed testimony. Mot. at 12–13. The Court should be advised that these two men were suspended from their positions at John Jay College in 2018 after two former students accused them of serious sexual misconduct—including rape and attempting to coerce women into prostitution—and of distributing drugs to, and using them with, their students.[3]

The students' allegations against Marcus and Curtis were accompanied by corroborating evidence, including a text message in which Curtis sent one of the women a photo of himself shirtless, and reports that security officers for the college found significant quantities of drugs and drug paraphernalia during an internal inquiry into the alleged conduct.[4] Following these

---

[3] William K. Rashbaum and David W. Chen, *John Jay Professors Face Allegations of Drug Sales and Sexual Misconduct*, N.Y. TIMES (Sept. 22, 2018) https://www.nytimes.com/2018/09/22/nyregion/john-jay-professors-allegations.html.

[4] Sara Dorn and Melissa Klein, *College Professors Allegedly Sold Drugs, 'Pimped' Out Students*, N.Y. POST (Sept. 22, 2018) https://nypost.com/2018/09/22/john-jay-professors-allegedly-ran-swamp-of-drug-dealing-sexual-assault/.

revelations, a group of academics and advocates called on John Jay College to examine the sex research done by the disgraced professors, expressing concern "that their research may also be tainted by sexual violence."[5] The college initiated disciplinary proceedings against Marcus, Curtis, and two other professors named in the allegations. According to a statement by college President Karol V. Mason, "[t]he investigators' final report meticulously documented unacceptable, unprofessional conduct by the professors that violated CUNY policies, including the Policy on Sexual Misconduct and Policy on Drugs and Alcohol."[6] An arbitrator appointed to review the disciplinary charges against Curtis sustained a number of the college's charges but determined that suspension without pay for a year was the appropriate remedy rather than termination—a decision which was binding on the college, despite President Mason's objections. The remaining three faculty members, including Marcus, were either not reappointed or retired in disgrace.

The ethical and reliability issues with the research defendant cites are obvious. The authors—who received about half a million dollars in public funding for their research[7]—determined that relationships between pimps and their victims are much less coercive than conventional wisdom holds, at the same time as they were sexually assaulting their own students and attempting to convince them to have sex with other men for their own benefit. The conflict

---

[5] Sara Dorn and Melissa Klein, *Academics Call On John Jay to Investigate Professors Accused of Pimping Out Students*, N.Y. POST (Oct 6, 2018), https://nypost.com/2018/10/06/academics-call-on-john-jay-to-investigate-professors-accused-of-pimping-out-students/

[6] Karol V. Mason, *Update on an Important Matter*, John Jay Coll. of Criminal Justice, https://www.jjay.cuny.edu/about/president-karol-v-mason/presidents-announcements-statements/update-important-matter

[7] Sara Dorn and Melissa Klein, *Professors Accused of Pimping Out Students Got Nearly $500K To Study Prostitution*, N.Y. POST (Sept. 29, 2018) https://nypost.com/2018/09/29/professors-accused-of-pimping-out-students-got-nearly-500k-to-study-prostitution/

of interest inherent in justifying illegal and unethical behavior, which the authors were themselves engaging in, obliterates the credibility of their research. Further, their inappropriate and unethical behavior towards their students raises serious concerns about their conduct with the vulnerable subjects of their research, further undermining any remaining scrap of reliability.

**iv. The Probative Value of Detective Lee's Testimony is Not Substantially Outweighed by Unfair Prejudice to Defendant**

The probative value of Detective Lee's testimony is described in detail in subparagraph i above. Defendant argues any probative value is outweighed by the risk of prejudice. It is not.

Defendant first complains that the jury will give undue weight to Detective Lee's expert testimony because he is also the case agent. The government's proposed jury instructions address this concern by instructing the jury that "[expert] opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness' knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in the case." The very next instruction also addresses this concern, reminding the jury that "the fact that a witness is allowed to express opinions based on that person's specialized knowledge, skill, experience, training, or education should not cause you to give that witness undue deference for any of aspect of that person's testimony or otherwise influence your assessment of the credibility of that witness."

Defendant also complains that a case agent's testimony, when based on the testimony of fact witnesses, may improperly bolster the credibility of those fact witnesses. The above instruction addresses this concern as well, cautioning the jury that an expert's opinion testimony "might rely on facts that are not based on his or her personal observations or involvement, but that opinion cannot serve as proof of the underlying facts." To the extent that Detective Lee's

expert notice or testimony in prior cases describe some features of sex trafficking that do not fit the facts of the instant case, defendant is free to cross-examine him on that issue. In fact, such testimony is relevant to the jury's understanding of the broader context of sex trafficking in which the charged acts occurred. It also reduces any prejudicial effect of Detective Lee's testimony. The jury will not be left with the impression that sex trafficking *always* starts out as a romantic relationship, or *always* involves violence, or *always* is carried out through the exact methods defendant utilized in this case. The jury instructions and Detective Lee's testimony itself will ensure that the jury uses his testimony as context for making sense of the events they will hear about through the testimony of fact witnesses—not as independent proof of defendant's guilt. Any prejudicial effect can be sufficiently mitigated by the jury instructions, and is eclipsed by the probative value of the testimony for a lay audience who may have naïve or unrealistic expectations of what a trafficker-victim relationship looks like.

**C. Confrontation Clause**

Defendant also argues that Detective Lee's testimony violates the Confrontation Clause and Rule 703 of the Federal Rules of Evidence. It would not.

Under Rule 703, an expert may rely on hearsay "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. Defendant does not argue that sex trafficking investigators would not rely on the type of information on which Detective Lee bases his opinions. The Ninth Circuit has held that, when an expert in a particular crime has "applied his training and experience to the sources before him and reached an independent judgment," without "directly repeating what someone else told him," his testimony about criminal operations does not offend the Confrontation Clause. *United States v. Holguin*, 51 F.4th 841, 856 (9th Cir. 2022). That is exactly what Detective Lee proposes to do

here. He will testify to patterns he has observed and conclusions he has drawn about the behavior of sex traffickers in his decades of experience in the field; he will not testify to any specific hearsay statements or present the substance of such statements as fact.

Defendant's reliance in *Mejia* is unavailing. In that case, the case agent performed over a dozen custodial interrogations of gang members and directly conveyed the substance of their out-of-court statements to the jury, including specific claims about the number of murders committed by the gang and their practice of taxing non-member drug dealers. *United States v. Mejia*, 545 F.3d 179, 199 (2d Cir. 2008). Because he did not—and in the court's view, could not conceivably have—"appl[y] his expertise" to these statements before conveying them to the jury, as required by *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007), the court found that his testimony violated the Confrontation Clause. *Mejia*, 545 F.3d at 199. Detective Lee proposes to do no such thing. His opinions are based on his observations and investigations of sex trafficking methods over more than two decades and are not the simple regurgitation of the testimonial out-of-court statements of others that the Second Circuit condemned in *Mejia.* To the extent his opinions rely in some part on interviews with sex traffickers and their victims, he has applied his expertise to their statements by assessing the credibility of the interview subjects, considering their claims in the context of documentary and other evidence of sex trafficking methods that he has collected and reviewed through his numerous investigations, and synthesizing the specific instances described by subjects into opinions about the general patterns and methods involved in sex trafficking.

Detective Lee's proposed testimony complies with the Confrontation Clause.

## CONCLUSION

Detective Lee's proposed expert testimony is relevant, reliable, and well-supported by his background in the field. The support for his testimony is detailed in the United States' expert notification at ECF No. 70, which is enough to support a reliability finding.[8] The Court should deny defendant's motion without a hearing.

Dated: October 9, 2026.

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

*/s/ Mira Chernick*
MIRA CHERNICK
WILLIAM M. McLAREN
Assistant United States Attorneys

---

8 The Honorable Adrienne Nelson recently made such a finding regarding Detective Lee's expert testimony in a sex trafficking case. *See United States v. Harris*, 23-cr-00076-AN (D. Or. 2025).